(Judges Haynes and Wildman of the sixth circuit, sitting in place of Judges Norris and Donnelly.)

CHRIST DIEHL BREWING CO. v. FERNANDO J. BECK (AUD.) ET AL.

BREWING COMPANY COLD STORAGE HOUSE LIABLE FOR DOW TAX.

A brewing company, manufacturing and selling beer at wholesale, which maintains a cold storage house in a location separate from its manufactory, and from which cold storage house daily deliveries of beer are made to customers on orders previously taken by a soliciting agent, thereby becomes a trafficker in intoxicating liquors within the meaning of Rev. Stat. 4364-9 (Lan. 7248) and is subject to the Dow tax provided for by that act.

[For other cases in point, see 5 Cyc. Dig., "Intoxicating Liquors," §§ 86, 87.—Ed.]

[Syllabus by the court.]

**B. F. Enos** and **Donovan & Warden,** for plaintiff.

**T. A. Conway,** for defendants:

Cited and commented upon the following authorities: Benjamin, Sales 1, 2, 313, 330, 360, 399; 1 Mechem, Sales 3, 4, 6, 7, 572, 714, 721, 723, 726, 727, 728, 729, 733; 2 Mechem, Sales 957, 958; 2 Bouvier's Law Dict. 492; 17 Am. & Eng. Enc. Law (2 ed.) 297, 300; *Scudder* v. *Worster,* 65 Mass. (11 Cush.) 573; *Bellefontaine* v. *Vassaux,* 55 Ohio St. 323 [45 N. E. Rep. 321]; *Stephens* v. *State,* 10 O. F. D. 81 [93 Fed. Rep. 793]; *Jung Brew. Co.* v. *Talbot,* 59 Ohio St. 511 [53 N. E. Rep. 51]; *DeMonte* v. *Pabst,* 14 Dec. 97; *State* v. *Low,* 12 Dec. 201; *Ormsbee* v. *Machir,* 20 Ohio St. 295; *Garbracht* v. *Commonwealth,* 96 Pa. St. 449 [42 Am. Rep. 550]; *Ramsey & Gore Mfg. Co.* v. *Kelsea,*

55 N. J. Law 320 [26 Atl. Rep. 907; 22 L. R. A. 420]; *Krulder* v. *Ellison,* 47 N. Y. 36 [7 Am. Rep. 402]; *Terry* v. *Wheeler,* 25 N. Y. 520; *Lingham* v. *Eggleston,* 27 Mich. 324; 23 Cyc. of Law & Proc. 185; *State* v. *Wingfield,* 115 Mo. 428 [22 S. W. Rep. 363; 37 Am. St. Rep. 406]; *Sneathen* v. *Grubbs,* 88 Pa. St. 147; *Braddock Glass Co.* v. *Irwin,* 153 Pa. St. 440 [25 Atl. Rep. 490]; *Commonwealth* v. *Burgett,* 136 Mass. 450; *Suit* v. *Woodhall,* 113 Mass. 391; *Herron* v. *State,* 51 Ark. 133 [10 S. W. Rep. 25]; *Abberger* v. *Marrin,* 102 Mass. 70; *Dolan* v. *Green,* 110 Mass. 322; *Pearson* v. *State,* 66 Miss. 510 [6 So. Rep. 243; 4 L. R. A. 834]; 22 Am. & Eng. Enc. Law (2 ed.) 1339, 1340; *Gipps Brew. Co.* v. *DeFrance,* 91 Iowa 108 [58 N. W. Rep. 1087; 28 L. R. A. 386; 51 Am. St. Rep. 329]; *Wasserboehr* v. *Boulier,* 84 Me. 165 [24 Atl. Rep. 808; 30 L. R. A. 344]; 24 Am. & Eng. Enc. Law (2 ed.) 1050, 1055; *Stein Brew. Co.* v. *Eberhard,* 23 Ky. Law 325 [62 S. W. Rep. 881]; *New England Dress. Meat & Wool Co.* v. *Worsted Co.* 165 Mass. 328 [43 N. E. Rep. 112; 52 Am. St. Rep. 516]; *Joseph* v. *Braudy,* 112 Mich. 579 [70 N. W. Rep. 1101]; *Hahn* v. *Fredericks,* 30 Mich. 223 [18 Am. Rep. 119]; *Williams* v. *Sayers,* 79 Miss. 50 [29 So. Rep. 995]; *Foot* v. *Marsh,* 51 N. Y. 288; *Haldeman* v. *Duncan,* 51 Pa. St. 66; *Hutchinson* v. *Hunter,* 7 Pa. St. 140; *Scotten* v. *Sutter,* 37 Mich. 526; *Diehl Brew. Co.* v. *Spencer,* 29 O. C. C. 512; *Starr Brew. Co.* v. *Horst,* 120 Fed. Rep. 246 [58 C. C. A. 362]; *Augustine* v. *McDowell,* 120 Iowa 401 [94 N. W. Rep. 918]; *Kellogg* v. *Frohlich,* 139 Mich. 612 [102 N. W. Rep. 1057]; *State* v. *Intoxicating Liq.* 98 Me. 464 [57 Atl. Rep. 798]; *Farmers Phosphate Co.* v. *Gill,* 69 Md. 537 [16 Atl. Rep. 214; 1 L. R. A. 767; 9 Am. St. Rep. 443]; *Brown* v. *Wieland,* 116 Iowa 711 [89 N. W. Rep. 17; 61 L. R. A. 417]; *Dunn* v. *State,* 82 Ga. 27 [8 S. E. Rep. 806; 3 L. R. A. 199]; *Commonwealth* v. *Hess,* 148 Pa. St. 98 [23 Atl. Rep. 977; 17 L. R. A. 176; 33 Am. St. Rep. 810]; *State* v. *Basserman,* 54 Conn. 88 [6 Atl. Rep. 185]; *Bagley* v. *State,* 82 Ga. 786 [9 S. E. Rep. 721]; *Berger* v. *State,* 50 Ark. 20 [6 S. W. Rep. 15]; *Doster* v. *State,* 93 Ga. 43 [18 S. E. Rep. 997].

**HURIN, J.**

This action was brought to enjoin the collection of certain taxes and assessments levied for the years, 1902, 1903 and 1904 under and by virtue of Rev. Stat. 4364-9 (Lan. 7248) *et seq.,* and commonly known as the Dow tax.

These taxes were placed upon the tax duplicate by the auditor of Henry county, Ohio, upon receiving satisfactory information that the plaintiff was engaged in the business of trafficking in intoxicating liquors in the villages of Holgate and Deshler in said county.

Henry County.

The case is before us on appeal and was heard upon an agreed statement of facts.

The facts essential to an understanding of the case are as follows:

The plaintiff is a brewing company engaged in manufacturing and selling beer at wholesale in Defiance, Defiance county, Ohio. It had during the years, 1902, 1903 and 1904, a cold storage house at Holgate and one at Deshler, both in Henry county.

Its method of doing business in Holgate and Deshler was to send its soliciting agent to those places periodically—perhaps once a month or oftener. This agent took orders from saloonkeepers for the amount of beer which they would need during the next period of thirty days or until he would next make his round. These orders were sent to the main office of the brewing company at Defiance for approval.

From its brewery in Defiance, the brewing company would then ship in car-load lots to Holgate and Deshler an amount of beer sufficient for the demand in those places. The beer so shipped was consigned to itself, the Christ Diehl Brewing Company, and was received by its agents in Holgate and Deshler and stored in its cold storage houses in those towns and none of it was in any way designated or set apart for any particular customer.

Each morning and evening, the agent of the brewing company at Holgate and at Deshler would make the round of the saloons in his town; inquire of each saloonkeeper how much beer he would need for the day or part of a day; enter that amount with the price thereof on a book which he carried with him; make a duplicate entry on the book kept by the saloonkeeper; and afterwards would deliver by wagon to the saloonkeeper the amount and kind of beer so ascertained to be needed, taking such amount of beer from the general stock on hand in the cold storage house and continue to so do until the amount previously ordered by any customer had been delivered to him.

The price of the beer was at all times fixed by the brewing company at Defiance or by the soliciting agent. As a rule the agents at Holgate and Deshler collected no money, though they occasionally did so and especially from customers who were considered financially unsound. The collections of money for the beer so delivered were usually made by the soliciting agent at his next call.

It is also agreed that all of the beer so delivered from said cold storage houses was intoxicating liquor and was not sold upon prescription issued in good faith by reputable physicians in active practice or for exclusively known mechanical, pharmaceutical or sacramental pur-

poses, but was sold by plaintiff to its said customers to be retailed by them as an intoxicating liquor in the usual retail trade.

The question before us is, was the business thus engaged in by plaintiff in Holgate and Deshler a *trafficking* in intoxicating liquor within the meaning of Rev. Stat. 4364-9 (Lan. 7248) and the following sections of the statute. If it was not, plaintiff is entitled to the injunction prayed for. If it was such a business, the injunction was wrongfully granted and must be dissolved.

Laning Rev. Stat. 7256 (B. 4364-16) defines the term "trafficking in intoxicating liquors" as follows:

"The phrase, 'trafficking in intoxicating liquors,' as used in this act, means the buying or procuring and selling of intoxicating liquors otherwise than upon prescription issued in good faith by reputable physicians in active practice, or for exclusively known mechanical, pharmaceutical or sacramental purposes, but such phrase does not include the manufacture of intoxicating liquors from the raw material, and the sale thereof at the manufactory, by the manufacturer of the same in quantities of one gallon or more at any one time."

It is evident that the whole question involved in this case depends on the one word "sale" and its definition.

When and where under the facts agreed upon in this case, did the "sale" take place?

Was the sale completed by the soliciting agent when he took the order for the supply of beer to each saloon for the coming month? or

Was it completed when the order for beer was accepted and confirmed by the home offices in Defiance? or

Was it completed when the beer for all the Holgate and Deshler customers was shipped in bulk to the cold storage houses in those towns? or

Was it completed when the beer was delivered by the agent of the brewing company from the cold storage houses to the saloons? or

Was it only completed when, after delivery, the soliciting agent again called, collected the money for the beer previously delivered, and solicited a new order?

We have been cited to many authorities, decisions of courts in this state and in others, construing the statutes involved in this case and similar statutes in other states.

Some of these it will be profitable for us to comment on and consider in their hearing on this case, always remembering, however, that there is no peculiar law applicable to cases of this kind except the constitutional and statutory law and that the case must ultimately be de-

..cided upon the broad principles applicable to all contracts of bargain and sale.

In the case of *Senior* v. *Ratterman,* 44 Ohio St. 661 [11 N. E. Rep. 381], it was held that,

"Section 18 of the schedule to the constitution, which provides that 'no license to traffic in intoxicating liquors shall hereafter be granted in this state; but the general assembly may, by law, provide against evils resulting therefrom,' applies as well to the wholesale as to the retail traffic in intoxicating liquors."

The statute then under consideration is the same one involved in the case at bar. It distinguishes between the obligations of a manufacturer of such liquors and all other dealers, but the court held that this distinction did not, by force of the constitution, extend to other wholesalers as distinguished from retailers.

Just why the legislature should have seen fit in its wisdom to impose a tax upon the small retailer of an article while it permits the manufacturer of that same article to make and sell it in car-load lots without any tax whatever is not apparent to the judicial mind; but such is the statute and the Supreme Court having upheld the constitutionality of the statute, we are not at liberty to discuss that feature of it, and it is not material to this case.

The question before us is not whether a brewery may or may not sell beer, from its brewery, without taxation,—that right is granted by the statute—but whether it may sell elsewhere than at its brewery, and whether a sale made as in the case at bar is a sale elsewhere than at the brewery.

The cases of *Hanson* v. *Luce,* and *Monaghan* v. *Luce,* 50 Ohio St. 440 [34 N. E. Rep. 435], are strongly relied on by the plaintiff to sustain its claim of exemption from taxation and those cases are very closely similar to the case at bar.

In both of those cases, saloonkeepers, having paid the Dow tax on their saloons, built cold storage houses for the storage of beer and then proceeded to engage in the wholesale sale of beer as well as the retail. Both employed agents who, as in the case at bar, took orders for beer, and these orders were supplied from the respective cold storage houses of plaintiff, but only in wholesale lots. The sales were made to all who wished to buy but no beer was sold at the cold storage house.

The Supreme Court held in those cases that such sales were permissible without incurring liability for additional taxes.

In both of those cases the cold storage houses were closely connected with the saloon on which the Dow tax had been paid. In one case,

Brewing Co. v. Beck.

the cold storage house was in the rear of the saloon, only four and a half feet distant from it and connected with the saloon by a covered way—practically the same building. In the other case, the cold storage house was on the opposite side of the street from the saloon but only 155 feet distant from it.

This fact may have had something to do with the decision of the cases; but it appears from the opinion that it was decided altogether on the conceded fact that "no beer was sold at said cooler."

From the opinion by the court, we quote as follows:

"It thus appears, that beer was neither bought nor sold at the cooler, but that all the business of buying and selling was done at the saloon, and that the cooler was a mere place of storage, and not a place of business, and that no traffic whatever was carried on at the cooler. No buying; no selling.

"It is difficult of comprehension how the business of trafficking in an article can be said to be carried on at a place where such article is neither bought, sold nor bartered.

"The traffic contemplated by the statute consists in the purchase and sale or barter of the liquors named therein, and the *place* of the traffic is the *place* where such purchase, sale or barter is had, and not the place where the liquors are stored for cooling or safe-keeping.

"The sales of beer made by the driver of the beer wagon, must be referred to the place where his employer carried on the traffic, and not to the place of storage."

I have quoted thus extensively from the opinion in those cases because it seems to disclose the theory on which the decision was rendered and to emphasize both the similarity and the dissimilarity of those cases with the case at bar.

If it is true in the case at bar, as was conceded in those cases, that there was no traffic or sale at the cold storage houses, then those cases are conclusive in the present instance. But that is the very point that is to be determined in this case. There it was conceded that no beer was sold at the cooler. Here it is contended that beer *was* sold from the cooler, or cold storage house. This is the vital point in this case.

The case of *Jung Brewing Co.* v. *Talbot*, 59 Ohio St. 511 [53 N. E. Rep. 51], is also an interesting case.

In that case it appeared that the brewing company located in Cincinnati, maintained a cold storage house in Urbana, Champagne county, "where beer, shipped from the brewery, was received and kept on hand ready for sale and delivery to customers in the latter city, from time to time as they might order. The sales were not made directly at the

storage room, but were made by agents and employes of the plaintiff who drove wagons for that purpose which were supplied with beer in the keg from the storage room.''

The court held that the business conducted in that manner was taxable, and on page 516 of the opinion the court say:

''If customers had made their purchases or received the property at the building (meaning the cold storage building) it would undoubtedly have been a place of traffic. Instead of conducting the business in that way the agents who had charge of the building and contents obtained orders from the customers which they filled by hauling the beer from the building to the customers. That was merely a matter of convenience to the purchaser or inducement to buy. The building where the property sold was situated, and from which it was delivered, was, for every practical purpose, the place where the business was carried on. The substantial distinction between this case and the cases of *Hanson* v. *Luce* and *Monaghan* v. *Luce*, 50 Ohio St. 440 [34 N. E. Rep. 435] is, that in the latter cases the storage room was used in connection with, and as part of, the wholesale and retail traffic carried on by the proprietor at his saloon where all the business was done, and for which he had paid the tax. In such a case, it was held he was not subject to a separate tax on account of the use made of the storage room.''

Here we find a close similarity to the case at bar and the court holds that, though ''the agents who had charge of the building and contents obtained orders from the customers which they filled by hauling the beer from the building to the customers, that was merely a matter of convenience to the purchaser, or inducement to buy. The building where the property sold was situated, and from which it was delivered, was, for every practical purpose, the place where the business was carried on.''

But plaintiff in the case at bar insists that the manner of sale in this case, the fact that a blanket order had previously been taken and that the daily orders delivered from the cold storage houses were merely designations of what was immediately needed, takes it out of the rule thus laid down.

A case perhaps still more nearly identical with this case is that of *Bellefontaine* (*Vil.*) v. *Vassaux*, 55 Ohio St. 323 [45 N. E. Rep. 321].

There a brewery company at Sidney owned a cold storage house at Bellefontaine. There was evidence tending to show that customers in Bellefontaine ordered beer of the brewing company at Sidney, which, thereupon, shipped it to the purchaser at Bellefontaine, but in care of its own agent who stored the beer in the cold storage house and deliv-

Brewing Co. v. Beck.

ered it to the purchaser only when paid for. In that case there was an attempt to show that the beer for each purchaser was set apart by itself in the storage house in a rack labeled with the initial of the purchaser's name but there was no attempt to show a separation between the beer ordered by two men with names of the same initial letter.

The court held that such evidence justified a conviction on the charge of selling intoxicating liquor in violation of law.

The case is especially important because of the discussion in the opinion of the question as to what constitutes a sale and to that question it is necessary continually to return; for on it this case must depend.

What, then, is a sale and when is it complete?

2 Blackstone's Commentaries 446, says it is "a transmutation of property from one man to another in consideration of some price."

Kent calls it "a contract for the transfer of property from one person to another for a valuable consideration." 2 Kent's Commentaries 468.

Benjamin on Sales Sec. 1, declares that "It may be defined to be a transfer of the absolute or general property in a thing for a price in money."

Mechem on Sales defines it as "The transfer, in pursuance of a valid agreement, from one party, called the seller, to another called the buyer, of the general or absolute title to a specific chattel, for a price, or a consideration estimated in money" and says further that "the sale takes place only when the title passes."

In all of these definitions, except that of Kent, a transfer of title or property is held to be a necessary element of a sale; and in Kent's definition it is the contract for the transfer which constitutes a sale.

But in all of these authorities it is held that it is not the mere contract to sell that makes a valid sale. There must be something more —an actual setting apart,—not necessarily a delivery, though usually a delivery of the thing bargained for. Until such setting apart or delivery takes place the thing contracted for remains the property of the seller, although the buyer may recover damages for the failure to perform the contract by a delivery. This delivery may be constructive, as when it is made to a common carrier for transfer to the purchaser, but, even there, there must be some setting apart of the thing to be delivered.

This conclusion was followed by the Supreme Court in *Bellefontaine (Vil.) v. Vassaux, supra,* the court holding that,

Henry County.

"As a general rule, a sale of personal property is not completed when anything remains to be done to identify the thing sold, or discriminate it from other like things."

This rule has been held to be varied by particular customs under certain conditions, but is the general rule applicable in all cases, where no special custom is found to the contrary.

Applying these principles to the case at bar, when could the buyer first point to any particular keg of beer and say "that is mine." Not when he gave the order to the traveling salesman; not when that order was approved at the home office of the brewing company; not when the beer for all the customers in Holgate or Deshler had been shipped and stored together in the cold storage houses in those towns. Up to this point no title had passed. Any creditor of the brewing company could have seized the beer and held it by attachment as the property of the brewing company.

But when the agent of the brewing company took that beer from this cold storage house, setting apart some of it for one customer and some for another and, from the cold storage house, began the delivery of their portions to the respective purchasers, then the brewing company lost its title and the purchaser gained it whether payment had been made or not. Then the sale was complete.

Does it follow, as claimed by the plaintiff, that in such event the final delivery being at the purchaser's saloon was not at the cold storage house and therefore the business cannot be taxed? We think not. As in the case of *Jung Brewing Co.* v. *Talbot, supra,* the court held that the business to be taxed was not done on the wagon but at the place from which the wagon was loaded and the beer delivered; so here, the beer was delivered from the cold storage house and as was said in that case:

"The building where the property sold was situated, and from which it was delivered, was, for every practical purpose, the place where the business was carried on."

But the plaintiff distinguishes that case from this, because there the agent who managed the cold storage house also solicited orders and sold the beer, while here the orders were all previously taken by another agent and only beer already ordered was delivered. It would be difficult to distinguish these two cases and the Bellefontaine case upon any principle known to us.

The distinction is, we think, without force. True, the order had

Brewing Co. v. Beck.

previously been given, but the execution of it, the completion of the actual sale was carried out only from the cold storage house and by the agent in charge thereof.  Until such delivery, there was no completed sale—no setting apart of any particular beer—no transfer of any title to any particular kegs or barrels of beer.  The business was conducted from the cold storage house and only completed by the agent in charge of that house.  We cannot believe that there is any substantial distinction which would take this case out of the rule laid down in *Jung Brewing Co.* v. *Talbot, supra,* and in *Bellefontaine (Vil.)* v. *Vassaux, supra.*  If there was no completed sale by the soliciting agent, and none at the home office, then the only other places where a sale could have been completed was either at the cold storage house or from the delivery wagon at the door of the saloon.  The Jung Brewing case negatives the latter construction and this is in accord with the universal commercial law.  There remains only the one possible place of sale and that is at the cold storage house.

We have reached this conclusion after a most careful consideration of the authorities.  In doing so we have been somewhat embarrassed by an able opinion, recently published*, rendered by a former judge of this same circuit, an opinion concurred in by all the judges then members of this court, for all of whom we have the highest personal and professional regard and whose opinions are always worthy of the highest consideration.  The plaintiff in that case is the plaintiff in this case.  The facts in the two cases are substantially identical.  But the conclusion reached by the court as then constituted was directly opposite to that at which we have arrived.

We have read the opinion in that case with great care but have been unable to agree with the conclusions there reached.

It may not be amiss to consider in conclusion the effect of a contrary view.  Under that holding the brewing company—merely because it is a manufacturer—might establish in each county in the state and in each town in each county, a depot of supplies.  Its agents might there conduct what is in all essential respects a wholesale business and without taxation—a privilege denied to all other wholesalers of beer.

From these depots, beer might be delivered continuously to all retail customers and new orders continuously taken, provided only that formal blanket orders have previously been taken and approved by the home office and the price subsequently collected by some one other than the manager of the depot of supplies—the cold storage house.

The brewing company might thus by a simple subterfuge get

---

*Contra.  *Christ Diehl Brew. Co.* v. *Spencer,* 29 O. C. C. 512.—Ed.

around the law and conduct a limitless number of subsidiary whole-sale houses without taxation—just what the law prohibits in all others.

We do not think that such an interpretation of the law is con-sistent either with the decisions of our Supreme Court or with the spirit. of the law or even with its letter.

The finding of the court will therefore be in favor of the defend-ant; the injunction dissolved. Judgment against plaintiff for costs; execution awarded and the cause remanded for execution.

**Haynes** and **Wildman, JJ.,** concur.